Edward DHAYER, et al., Plaintiffs,

v.

**WEIRTON STEEL DIVISION OF NATIONAL STEEL CORPORATION: and Independent Steelworkers Union, Defendants.**

Civ. A. No. 83–0036–W.

United States District Court,
N.D. West Virginia,
Wheeling Division.

Sept. 8, 1983.

John R. Spon, Jr., Keith Fournier, Steubenville, Ohio, for plaintiffs.

Carl H. Hellerstedt, Jr., Pittsburgh, Pa., Carl N. Frankovitch, David L. Robertson, William Kiefer, Peter Rich, Weirton, W. Va., for defendants.

## MEMORANDUM OPINION AND ORDER

MAXWELL, Chief Judge.

This civil action concerns Defendant National Steel's Weirton Division (National) and activities in connection with a proposed employee buy-out plan. Although there are quite a few actions on this Court's docket having some factual connection with the proposed employee buy-out plan, this civil

action has moved in procedural tandem with two other actions filed within weeks of this action. They are *Sutton, et al. v. National Steel, et al.,* C.A. No. 83–35–W (filed March 30, 1983) and *Brunner, et al. v. National Steel, et al.,* C.A. No. 83–40–W (filed Apr. 13, 1983). The Plaintiffs in both *Brunner* and *Sutton* are members of the International Steelworkers Union (Union). It appears that all Plaintiffs in this action are salaried employees at Weirton Division, and are not Union members. These three civil actions largely concern employee benefit plan questions—severance pay and early retirement pensions.

Pending before the Court are a motion to dismiss filed by Defendant Union, an amended motion for summary judgment propounded by Defendant National, and a motion to defer ruling filed by Plaintiffs.

The record in this action includes the pleadings and exhibits thereto, and various affidavits offered in support of and in opposition to these motions. Believing that case law developing the common law principles of judicial notice and Rule 201, Federal Rules of Evidence, authorizes, indeed, mandates such, the Court will also consider testimony and exhibits adduced at hearings conducted on April 13, 1983, at Elkins, and on April 27–29, at Wheeling, in the earlier-mentioned companion matters, *Brunner* and *Sutton. See Kinnett Dairies v. Farrow,* 580 F.2d 1260, 1277 n. 33 (5th Cir.1978). From these matters of record, the Court finds the following facts are significant to the issues to be decided:

The Weirton Division of National Steel is the single largest private sector employer in the State of West Virginia. At one time, shortly after World War II, the Division had 16,000 workers, but the recent market for steel produced in the United States has reduced employment to some 11,000 in 1980, and about 7,000 currently.

In March, 1982, National Steel announced it would no longer make significant capital investment in its Weirton Division facilities, and that those facilities would be "downsized" over a period of time with a resulting level of employment of 1,200 to 2,000 workers in the late 1980's. The President of National Steel indicated the announcement was not an attempt to win labor cost concessions, but reflected the business decision of National to place its investment capital in other areas. In addition to National's announced intention to downsize the Weirton facilities, the options for the Division seemed to include finding a buyer for the Weirton mill who would be interested in future steel production or to devise a plan for an employee buy-out. National's management indicated a willingness to explore either of these options.

On the day of National's announcement, the International Steelworkers Union announced its intention to work with Weirton Division management to study the possibilities of employee buy-out, and, if feasible, to open negotiations with National Steel. The Weirton Joint Study Committee was incorporated to study the employee buy-out option and coordinated related efforts. The Committee's board of directors consists of five representatives of the Weirton Division management team, twenty-one representatives of the International Steelworkers Union, and three representatives of the Independent Guard Union. Funds for the various activities of this Committee were raised from the unions involved, community donations, grants from the State of West Virginia, and other sources.

In April, 1982, after a competitive selection process, the Joint Study Committee hired the consulting firm of McKinsey & Co. to conduct a feasibility study on the economic viability of an independent, employee-owned Weirton Steel company. In July, 1982, McKinsey & Co. released a report concluding that such a venture could be successful, but only if labor and production costs were reduced and if substantial capital improvements could be effected over a period of ten years.

The employee buy-out option preferred by the Joint Study Committee and the one pursued includes an Employee Stock Ownership Plan (ESOP), which will allow the new employee-owned corporation to borrow funds to finance the sale from National and

permit employees who satisfy minimum hours of work to earn shares of stock as initial loans are paid. An ESOP presents an opportunity for significant tax savings for the proposed company under the Internal Revenue Code.

As the employee buy-out plan progressed, the Joint Study Committee hired other consultants to assist in formulating various complex aspects of the procedure. These include the law firm of Ludwig & Curtis, of San Francisco, to advise on the structure of an ESOP; the law firm of Wilkie, Farr & Gallagher, of New York, to represent the Committee and the proposed new corporation in negotiations with National Steel regarding acquisition of the Weirton Division assets; the investment banking firm of Lazard Freres & Co., of New York, to assist with all questions of finance; the accounting firm of Towers, Perrin, Foster & Crosby, of Pittsburgh, to conduct an audit of National's pension plans for Weirton Division employees. All of these consulting firms, and others involved in the study, enjoy national or international reputations for expertise in the fields for which they were hired.

On March 11, 1983, National Steel and Wilkie, Farr & Gallagher (the law firm hired to negotiate a sale of Weirton Division assets for the Joint Study Committee) announced an agreement in principle for the terms of sale from National to Weirton Steel Corporation (the proposed employee-owned company). The agreement has been amended by an addendum announced April 8, 1983. During 1983, Wilkie, Farr & Gallagher formed a "shell" corporation in the State of Delaware in anticipation of the success of the employee buy-out venture.

Should the employee buy-out be implemented, Weirton Steel Corporation will succeed National Steel's Weirton Division as the largest private-sector employer in West Virginia. It will also be one of the largest corporations in the United States and *the* largest employee-owned corporation in the country. As all the parties are aware, the venture (like any large corporate undertaking) is not without risk. Consultants for the Joint Study Committee believe success is possible, given certain economic and social circumstances. However, it is realized that such expressions are only educated forecasts. Long term success depends upon the general economic trends, as well as trends specifically involving markets for the products produced at the Weirton facility.

In order to carry out the provisions of the agreement in principle, as amended, and to implement the employee buy-out, members of the Independent Steelworkers Union and the Independent Guard Union must conduct an election, now scheduled for a day certain, to modify existing collective bargaining agreements with National Steel. Both the mechanisms of the employee buy-out and the implications of such a venture are extremely complex. In order to inform union memberships of the various aspects of the proposal, the Joint Study Committee and its consultants have produced a "disclosure document" which they urge reveals all of the facts necessary to an understanding of the venture and its ramifications for the employees of the new Weirton Steel company.

Testimony adduced at hearings thus far and several of the documents submitted as exhibits lead the Court to believe that all, or a substantial majority of all, the active employees of National's Weirton Steel Division will be offered an opportunity to work for the proposed employee-owned company. It is recognized that the McKinsey & Co. feasibility study has recommended reductions in the entire work force, and considerable reductions in salaried workers to more closely match the manpower ratios of competing steel manufacturers; however, it is the Court's understanding that the reductions are to be reached through natural attrition.

Should the members of the two unions vote to approve proposed collective bargaining agreement modifications, each Weirton employee—union and non-union—will then make another important decision: whether to go to work for the new company. For some, this decision will be made more diffi-

cult because of the opportunity for immediate retirement from National with totally predictable pension and other benefits for the future. The terms of sale, as amended, include provisions that employees meeting the chronological age and years of service requirements for some of the types of retirement in the applicable pension plan may elect to retire five days after the union votes referred to above. Such election to retire will be effective as of April 30, 1983, one day before May 1, 1983, the accounting date established to be effective date of transfer of ownership.

All workers, whether they choose to work for the new company or not, will retain the pension benefits earned through service with National Steel prior to the transfer of ownership. Pension rights earned and accrued after the transfer of ownership (with the exception of certain "safety net" features to be discussed below) will be the responsibility of the new employee-owned company. Plaintiffs express the concern that pension rights earned after transfer to the new company will not be as secure as those earned under National, which has a proven record of corporate stability.

The pension plan for salaried, non-union employees at National Steel's Weirton Division is referred to in the record as National Steel Corporation Retirement Program, or Plan 001. (Exhibit A, attached to the Affidavit, dated May 31, 1983, of John A. McCreary, in support of National's Motion for Summary Judgment.) In limited circumstances, salaried, non-union Weirton Division employees may receive severance pay upon separation from employment with National. National's severance benefits provisions are set forth in the Weirton Division policy on termination of exempt salaried employees. (Exhibit A, attached to the affidavit of John A. McCreary, given June 21, 1983.)

STATEMENT OF THE ISSUES

■ This litigation focuses on the propriety of terms of sale regarding pension and severance pay benefits for salaried Weirton Division employees, who are not union members. Defendant National Steel filed a proposed statement of the issues and requested expeditious consideration of them. This was followed by the motion for summary judgment, as amended. Counsel for Plaintiffs have also filed a statement of the issues. The Court believes the issues presented by National's motion are fair statements of the major claims of the complaint, however, not every issue raised in the complaint is included within the motion for summary judgment. Therefore, the Court views National's motion as a motion for partial summary judgment. In contrast, the Court views Defendant Union's motion to dismiss as one requesting complete relief (as to the Union).

In general, the motion for summary judgment presents the legal issue of whether the terms of sale, which are proposed to amend existing pension or other employee welfare benefit plans, deprive any Plaintiff of a right or benefit guaranteed by law. The terms of sale (the earlier-mentioned agreement in principle announced March 11, and amended April 8, 1983) specify that the transfer of ownership, without more, will neither trigger entitlements to 70/80 or rule of 65 retirement under the applicable pension plan nor establish the basis for severance allowance payments. The terms also limit eligibility to 70/80 and rule of 65 retirements after the transfer.

The complaint charges the amendments that will be made in accordance with the terms of sale violate various provisions of the Employee Retirement Income Security Act (ERISA) and the terms of the applicable pension plan. In addition, the complaint charges both Defendants with conspiracy, discrimination, bad faith breach of an implied covenant of fair dealing, deprivation of property without due process of law, deprivation of rights under a collective bargaining agreement, and other acts and omissions.

From an examination of the pleadings, the motions of Defendants, and other matters of record, the Court defines the following specific issues for resolution:

1. Whether the terms of sale proposed to amend 70/80 and rule of 65 retirement

provisions of the National Steel pension agreement violates:

    a.   provisions of ERISA relating to prohibited transactions;

    b.   provisions of ERISA relating to fiduciary duties imposed upon National Steel;

    c.   provisions of ERISA relating to vested, accrued benefits or non-forfeitable benefits;

    d.   provisions of the pension plan.

    2.   Whether the terms of sale proposed to amend the National Steel policy on termination of exempt salaried employees violates:

    a.   provisions of ERISA relating to prohibited transactions;

    b.   provisions of ERISA relating to fiduciary duties imposed upon National Steel;

    c.   provisions of ERISA relating to vested, accrued benefits or non-forfeitable benefits;

    d.   provisions of the policy itself.

    3.   Whether the "First Cause of Action" of the complaint states a claim upon which relief can be granted against Defendant Union.

    4.   Whether the Court has subject matter jurisdiction over any of the claims asserted against Defendant Union in the "Second Cause of Action" of the complaint.

At the risk of being repetitive, the Court would note a few matters not considered in this decision. No issue concerning pension benefits provided by the proposed, employee-owned company is decided (nor is one raised by this litigation). No issue concerning any individual Plaintiff's immediate right to an early retirement or severance pay benefit is decided; instead, the Court limits its ruling to the effect of the proposed amendments to the pension plan and severance pay policy for salaried, non-union personnel as a group.

1.  Although the Plaintiffs have appended a copy of a summary of this plan to their complaint, the Court relies on the language of the full corporate pension plan document for all purposes having to do with Defendants' motions. (Exhibit A, affidavit of John A. McCreary, Vice

## PENSION BENEFIT ISSUES

Under the existing pension plan between National and its salaried, non-union employees at the Weirton Division, there appears to be eight distinct types of retirement, or methods of determining eligibility for a pension.[1] For normal retirement, 62/15 retirement, 30-year retirement, and 60/15 retirement, the plan participant becomes eligible simply through achievement of certain chronological age and years of service factors. Participants with 15 years of service who become permanently incapacitated, as defined in the plan, are eligible for permanent incapacity retirement. Persons with 10 years of service whose continuous service is broken for any reason are eligible to receive a deferred vested pension after reaching age 62 or 65, depending on the participant's age at the time service was broken. The remaining types of retirement, rule of 65 retirement and 70/80 retirement, are the subject of the pension issues in this litigation. Age and years of service are aspects included in determining eligibility.

The factors are as follows:

    6.   *70/80 Retirement.* Any Participant who has not attained the age of 62 years and who shall have had at least 15 years of Service and (i) shall have attained the age of 55 years and whose combined age and years of Service shall equal 70 or more, or (ii) whose combined age and years of Service shall equal 80 or more, and

        (a) whose Service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof or by reason of a layoff or physical disability, or

        (b) whose Service is not broken and who is absent from work because of physical disability or a layoff and whose return to active employment is declared unlikely by the Company, or

President, Human Resources of National Steel, given May 31, 1983. National Steel Corporation Retirement Program, effective January 1, 1962, as amended to and including August 1, 1980.)

(c) who considers that it would be in his interest to retire and the Company considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions, shall be eligible to retire on or after August 1, 1980 and shall upon his retirement (hereinafter "70/80 retirement") be eligible for a pension.

7. *Rule-of-65 Retirement.* Any Participant (i) who shall have had at least 20 years of Service as of his last day worked, (ii) who has not attained the age of 55 years, and (iii) whose combined age and years of Service shall equal 65 or more but less than 80, and

(a) whose Service is broken by reason of a layoff or disability, or

(b) whose Service is not broken and who is absent from work by reason of a physical disability or a layoff and whose return to active employment is declared unlikely by the Company, or

(c) who consider that it would be in his interest to retire, and the Company considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions, and

who has not been offered suitable long-term employment shall be eligible to retire on or after August 1, 1980, and shall upon his retirement (hereinafter "rule-of-65 retirement") be eligible for a pension; provided, however, that if at the time of application for retirement the Company has not yet determined whether the Participant will be offered suitable long-term employment, the Participant will not be eligible to retire until the earlier of the date on which the Participant incurs a break in Service.

In addition, among the provisions in the plan for calculating the amount of pension under the various types of retirement, increased pensions are described for 70/80 and rule of 65 (and permanent incapacity). With certain exceptions, the monthly amount determined under the regular rules is now apparently increased by $400.00 for beneficiaries of 70/80 and rule of 65 retirement.

The terms of sale from National to the employee-owned company will require a number of changes in the existing pension agreement. However, it is apparent that no change will be effected to decrease any accrued benefit, determined under the existing plan, and National Steel shall remain liable for all accrued benefits "earned" prior to the closing date. Under the terms of sale, National will segregate the liabilities and assets of the existing fund attributable to Weirton Division employees (the existing fund covers employees at other National Steel divisions in addition to Weirton) and establish a separate trust fund and insurance contract which will only be available to pay benefits to Weirton Division employees, including those already retired, those transferring to the new company, and those on layoff status.

National Steel employees who remain working under the new employee-owned company will, in effect, look to both National and the new company for pension benefits upon retirement. The terms of sale provide a method of calculating benefits payable by each company, which is based on each individual's years of service with each employer.

Especially pertinent to this litigation are the terms which modify the eligibility for 70/80 retirement and rule of 65 retirement and the increased pension benefits for these types of retirement. For transferred employees only (those who were employees of National and who choose to become employees of the new company), conditions giving rise to eligibility for 70/80 and rule of 65 retirement will be limited to a permanent shut-down of the new company's operations which occurs within five years of the transfer of ownership date for accounting purposes (May 1, 1983). The increased pension ($400 per month) will only be payable if a permanent shutdown occurs. The terms of sale also require that the pension plan and other benefit plans be modified to reflect the fact that the sale and transfer of own-

ership does not constitute a shutdown for purposes of pension or retirement benefits or severance allowance. (Thus, the sale and transfer of ownership, without more, will not trigger eligibility to any of these benefit programs.)

■ It is not per se unlawful to alter a pension plan with respect to prospective benefits, provided the change doesn't violate other ERISA requirements. *See Fentron Industries v. Nat. Shopmen Pension Fund,* 674 F.2d 1300, 1306 (9th Cir.1982). The Court must decide whether the amendments proposed to 70/80 retirement and rule of 65 retirement violate the Act's minimum requirements for vesting, accrued benefits, or non-forfeitability.

■ In general terms, the labor law provisions of ERISA provide a system of safeguards designed to strengthen private employee pension and welfare benefit plans. (The provisions of ERISA made part of the Internal Revenue Code are generally not at issue here.) ERISA does not require an employer to offer any type of benefit, but, if it does so, the plan must comply with the minimum requirements of the Act.

■ With regard to pensions, ERISA imposes no obligation on a plan to pay benefits before an employee reaches normal retirement age. Any right to earlier benefits must be found in the individual agreement. *Fine v. Semet,* 699 F.2d 1091, 1093 (11th Cir.1983) (citing *Pompano v. Michael Schiavone & Sons,* 680 F.2d 911 (2nd Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). Under ERISA, normal retirement age means the earlier of normal retirement age under the plan or the later of the time the participant attains age 65 or reaches the 10th anniversary of participation in the plan. 29 U.S.C. § 1002(24). The plan in issue defines normal retirement age as 65.

■ An accrued benefit is the interest in the plan to which a participant has become entitled. Am.Jur.2d *Pension Reform Act* § 73 (1975). In the case of a defined plan, it means an individual's rights to a retirement benefit determined under the plan,

expressed in the form of an annual benefit starting at *normal retirement age.* 29 U.S.C. § 1002(23)(A) (emphasis supplied). A non-forfeitable pension benefit or right is a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, *which is unconditional,* and which is legally enforceable against the plan. 29 U.S.C. § 1002(19) (emphasis supplied). In sum, ERISA is designed to protect plan benefits for normal age retirement which are unconditional.

■ Accrued benefits under ERISA are not intended to include such things as conditional benefits, premiums for medical and life insurance payable as a lump sum, or the value of the right to receive early retirement benefits. *See* H.R.Report No. 93–807, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code, Cong. & Ad.News 4639, 4670, 4726. Am.Jur.2d *Pension Reform Act* § 73 (1975). *See generally, Petrella v. NL Industries,* 529 F.Supp. 1357, 1365–1366 (D.N.J.1982). These are ancillary benefits which may be amended or deleted without violating ERISA. *Id.*

An examination of the eligibility requirements for 70/80 and rule of 65 retirement reveals they are conditional and in the nature of early retirement benefits and cannot be considered non-forfeitable or as an accrued benefit. *Capocci v. General Motors Corp.,* 444 F.Supp. 1306, 1307–1308 (D. Hawaii 1978). Since the increased $400.00 per month pension payment is conditioned upon eligibility for 70/80 or rule of 65 retirement, it cannot be considered non-forfeitable. The Court has considered the potential applicability of 29 U.S.C. § 1056(a) and finds that it does not require a contrary mandate on the issues raised here.

■ Under ERISA, "vesting" is a term that is obviously tied to the term "accrued benefit." To prevent any possible misunderstanding of the Court's language in the previous paragraph, the proposed terms of sale with regard to 70/80 and rule of 65 retirement and the increased pension pay-

ments thereunder do not violate any minimum vesting standards under ERISA. This is because the terms of sale affecting pensions do not disturb the normal retirement benefit or the deferred vested pension benefit, *See* 29 U.S.C. § 1053, and since the terms of sale provide that all accrued benefits shall become vested upon transfer of ownership. *See* 26 U.S.C. § 411(d)(3).

In short, Congress did not intend to impose upon a plan a requirement that any benefits be payable before reaching age 65 or the normal retirement age (65 in this case) under the plan. *Riley v. MEBA Pension Trust,* 452 F.Supp. 117, 120 (S.D.N.Y.) *aff'd,* 586 F.2d 968 (2nd Cir.1978).

■ Plaintiffs claim the amendments to the pension plan will violate the basic terms of the plan itself. All pension plans subject to ERISA must include a provision for plan amendment. 29 U.S.C. § 1102(b). National's power to amend or modify the program within certain bounds is set forth in Section VIII of the plan. It cannot be said that amendments to the pension plan are per se violations of ERISA or per se violations of the plan as a contract; both the Act and the plan itself anticipate changes and modifications.

Plaintiff's allegation that the amendments violate the plan itself would seem to assume that all provisions in the agreement are "written in stone," and never subject to change. Such is not sound law. A proposed amendment would only violate the language of the pension plan when a particular individual's unconditioned rights are affected or when the amendment is unreasonable. *Rochester Corp. v. Rochester,* 450 F.2d 118 (4th Cir.1971). In other contexts, but in cases arising under ERISA, the Supreme Court has said, "it is the claim to the benefit rather than the benefit itself that must be 'unconditional' and 'legally enforceable against the plan.'" *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). *Nachman Corp. v. P.B.G.C.,* 446 U.S. 359, 371, 100 S.Ct. 1723, 1731, 64 L.Ed.2d 354 (1980). Since the Court has earlier found that any rights a particular Plaintiff might

have under 70/80 and rule of 65 retirement are contingent and conditional, it must also find that a proposed amendment to the provisions for these types of retirement do not violate the terms of the agreement itself.

Further, the proposed changes must be seen as reasonable. Here, the amendments are proposed in the context of an anticipated change in ownership where the majority of active workers will immediately become employees of the new owner. Since a "shutdown" of National's Weirton Division is not anticipated, in any sense, it is reasonable to propose amendments which would clarify existing language regarding shutdown and suitable long-term employment. The present eligibility for 70/80 and rule of 65 retirement conditions also include such things as layoff, disability, and other matters involving the discretion of the employer. Since the proposed amendments only affect a situation that would arise after a transfer of ownership, the Court must find that eliminating such conditions are reasonable since they are properly the concern of the relationship between the new employer and the employee.

The terms of sale include what has been labeled by counsel as a "safety net" feature. In effect, National will continue to offer its former employees 70/80 and rule of 65 retirements if, and only if, the new company should suffer a shut-down of substantially all of its facilities within five years of the closing or transfer date. National Steel was not required to extend this "safety net" feature to its former employees under ERISA. This is a term of sale that negotiators acting on behalf of the new company were able to extract from National.

■ Plaintiffs contend that the terms of sale, if carried out, will result in a prohibited transaction and a violation of fiduciary duties under ERISA. These allegations appear to have several bases. First, it is claimed that the sole motivation of National Steel in desiring to divest or "downsize" the Weirton Division is to avoid unfunded pension "obligations" to employees. (Complaint, § 53.) Plaintiffs also assert that

"vested, inchoate pension benefits" are being "sold" or constitute part of the sale proposed between National Steel and a new company. (See, e.g., Plaintiff's Submission of Issues, §§ 3, 7, 8.) A third basis is the earlier mentioned fear of some Weirton workers that some pension rights "earned" after transfer to the new company will not be as secure as those "earned" under National Steel. (See Affidavit of William W. Willoughby, given May 25, 1983, in opposition to motion for Summary Judgment, § 9.) Finally, it is asserted that National Steel has not acted solely in the interests of pension plan beneficiaries and participants. (See, e.g., Complaint §§ 46, 53.)

The assertion concerning the motivation of National Steel is contrary to a considerable mass of evidence offered by counsel for the *Dhayer* Plaintiffs in the *Sutton* case. (See, e.g., Letter of Richard Arango, Plaintiffs' Exhibit 9, hearing of April 27, 1983; The Independent News, March 16, 1982, at 1, Plaintiffs' Exhibit 10, hearing of April 27, 1983.) The claim that pension benefits are being sold directly conflicts with the very document Plaintiffs challenge in this civil action. The terms of sale proposed in the agreement in principle announced March 11, 1983, clearly indicate that all assets and liabilities of National Steel's pension plan that affect any former or present Weirton Division employee will be segregated and transferred to a separate trust, fund, and/or insurance contract, which will be available only to pay benefits to Weirton Division employees. (Proposals for Acquisition from National Steel, etc., Section III, A and D, Exhibit to Complaint.)

It is recognized that grant of summary judgment is precluded where there is a genuine dispute as to material facts in issue, even where the assertions of the opposing party are fantastic or highly improbable. *Arnstein v. Porter,* 154 F.2d 464 (2nd Cir. 1946). In this action the Court is of the opinion that the two sets of assertions set forth above do not preclude summary judgment.

The assertions with regard to National Steel's motivations for divestiture are not disputed. There is only a conflict in the evidence offered by Plaintiffs. No Defendant has offered a factual basis for National's motivation, and, for the purposes of expediting its summary judgment motion, Defendant National has accepted Plaintiffs' position with regard to motivation. (See Defendants motion for Protective Order, etc., § 4.) A rational interpretation of the evidence presented by Plaintiffs here and in *Brunner* and *Sutton* would be that avoiding future pension obligations to employees of the Weirton Division was *one* of the factors motivating National Steel to consider "downsizing" or divesting the Division. However, in resolving the issues of alleged prohibited transaction and fiduciary duty, questions, the Court will assume that avoiding future pension obligations was the sole motivation of National, as alleged by Plaintiffs.

The assertions with regard to a sale of "vested inchoate pension benefits" is in conflict with credible and uncontroverted facts and must be viewed as a mistake or frivolous assertion designed merely to avoid summary judgment. See Fed.Proc., L.Ed. § 62:550 (1981). The terms of sale which both Plaintiffs and Defendants agree will control the transfer of ownership clearly indicates that no "vested inchoate pension benefits" will be sold by National Steel to anyone. The Court recognizes that pension issues are a factor considered by all parties to the proposed sale (See Pension calculations audit by Towers, Perrin, Forster, & Crosby at 1, *Sutton* Plaintiffs' Exhibit 23, hearing of April 27, 1983), but no pension "obligations" are being transferred from National Steel to the new employee-owned company.

With regard to the fear of some workers that pension rights "earned" under employment with the new company may not be as secure as those "earned" under National Steel, the Court believes that ERISA cannot be perceived as requiring federal courts to weigh the potential success of one company as opposed to another when divestiture of a plant through sale to another entity is proposed. Plaintiffs' search for

security of pension benefits to be earned (to become vested or accrued) at some point in the future is something that is not contemplated by ERISA (beyond insuring certain minimal benefits protected by the Pension Benefit Guaranty Corporation).

In summary, and in context with the limited legal issues before the Court, Plaintiffs' alleged prohibited transaction and fiduciary duty claims will be measured by the assertions that National's sole motivation in seeking a sale of the Weirton Division assets was the avoidance of future or prospective pension benefits obligations and that National Steel has not acted solely in the interests of pension plan beneficiaries and participants.

Specific rules relating to defined prohibited transactions are contained in 29 U.S.C. § 1106. A fiduciary is not permitted to have the plan engage in certain direct or indirect transactions with a party in interest. A plan fiduciary is prohibited from dealing with plan assets in his own interests, on behalf of persons whose interests are adverse to the interests of the plan, or from receiving any personal consideration as a result of plan transactions. *Id.* In addition to these specific prohibitions, general fiduciary standards are set forth in 29 U.S.C. § 1104. Plan fiduciaries must discharge duties with respect to an employee benefit plan solely in the interests of plan participants and beneficiaries. 29 U.S.C. § 1104. The fiduciary must act for the exclusive purpose of providing benefits to beneficiaries and must conduct the affairs of the plan with the care, skill, prudence, and diligence under the circumstances that a prudent man would use. Further the fiduciary must diversify the plan investments so as to minimize the risk of large losses, and must act in accordance with the documents and instruments governing the plan insofar as they are consistent with law. *Id.*

According to the terms of the pension plan, it is clear that National Steel is a fiduciary and must carry out duties with regard to plan management in accordance with the fiduciary standards set forth

above. An examination of the plan document reveals that certain designated National employees administer the plan with respect to payment of benefits, etc., but that the plan is financed through contributions to a trust fund managed and held by a separate entity.

It is the opinion of the Court that the duties with regard to prohibited transactions apply directly to activities affecting the fiscal assets of the plan funds. In other words, for the provisions of 29 U.S.C. § 1106 to apply, there must be a transaction involving the monies, property, or other assets of the fund. *See Donovan v. Bierwirth,* 680 F.2d 263, 270 (2nd Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983). This notion flows from the very language of the statute ("A fiduciary ... shall not cause the plan to engage in a transaction ..., etc.) and is supported by the legislative history. *See* H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code, Cong. & Ad.News, 4639, 5038, 5087–5089.

The segregation of National Steel pension fund assets relating to Weirton Division employees for transfer to a separate trust account, as contemplated in the terms of sale, is not the type of transaction, in the Court's judgment, which would invoke 29 U.S.C. § 1106. The Court earlier concluded that the assets of a pension fund were not being sold in any manner and neither the assets nor the liabilities of the National Steel pension fund were being transferred to the new company. The Court now finds that the terms of sale under consideration do not require a pension fund to conduct any transaction, prohibited or not prohibited, such as would implicate 29 U.S.C. § 1106.

It would appear that Congressional intent with regard to the more general fiduciary duties of 29 U.S.C. § 1104 also focusses on activities affecting the fiscal assets of the plan. *See* H.R.Rep. No. 93–533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News, 4639, 4659; S.Rep. No. 93–127, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News, 4838,

**328**

4847 and 4864–4865. However, some federal courts have expanded the expression of fiduciary duty beyond transactions involving pension fund assets. Without making a decision which would have precedential value in this jurisdiction, and limited to the facts presently before the Court for decision, it is the opinion of the Court that this hearing on motion for summary judgment requires acceptance of a liberal view of fiduciary duties under § 1104, thus giving Plaintiffs' opposition to the motion the broadest possible consideration. The dichotomy between Congressional intent and judicial treatment aside, it is firmly established that the standard for review of fiduciary action when a § 1104 violation is alleged is whether the action is arbitrary and capricious. *See, e.g., Fentron Industries v. Nat. Shopmen Pension Fund*, 674 F.2d 1300, 1307 (9th Cir.1982). Therefore, a violation of § 1104 fiduciary standards must be based on a showing of bad faith or some other indicia of arbitrary and capricious action. *Id.* and *Schulist v. Blue Cross of Iowa*, 553 F.Supp. 248 (N.D.Ill.,1982).

The Court's earlier finding that the proposed amendments to the pension plan, inherent in the terms of sale, do not violate ERISA's vesting and non-forfeitability provisions precludes any contention that a fiduciary duty was breached on the basis that some pension "obligation" will be limited or forfeited if the terms of sale are approved. *Petrella v. NL Industries, supra*, 529 F.Supp. at 1366–1367. *Cf. Brug v. Pension of Carpenters, etc.*, 669 F.2d 570, 574–576 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 135, 74 L.Ed.2d 116 (1982) (amending pension eligibility retroactively violates fiduciary duty on facts presented).

Plaintiffs' contentions that fiduciary duties are violated because National was motivated to avoid prospective pension benefits, and that National has not acted solely in the interests of pension plan beneficiaries and participants, suffer two fatal defects. First, embracing Plaintiffs' theory *in toto* would preclude *any* company offering pension benefits from amending the plan in such a way as to limit or eliminate provisions for benefits that are not vested or accrued. As stated before, such is not the state of the law.

Second, Plaintiffs' theory requires a view that *every* corporate decision arguably affecting pension benefits must be made solely in the interests of pension plan beneficiaries and participants. In the context of a decision which limits or eliminates prospective, conditional pension benefits, not required by the vesting and non-forfeitability provisions of ERISA, such is not the case.

■ The pension plan specifies that National Steel is responsible for the administration of the pension program. A "dual loyalty" inherently exists when the employer (which is naturally interested in keeping its costs for pension benefits at a minimum) also acts as administrator or fiduciary of a pension plan. However, ERISA contemplates and approves of such an arrangement in certain circumstances by providing that one may serve as a fiduciary in addition to being an officer, agent or other representative of an employer. 29 U.S.C. § 1108(c)(3). *See Donovan v. Bierwirth*, 538 F.Supp. 463, 468 (E.D.N.Y.1981), *aff'd as modified (on other grounds)*, 680 F.2d 263 (2nd Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983). *Flinchbaugh v. Chicago Pneumatic Tool Co.*, 531 F.Supp. 110 (W.D.Pa.1982). When acting on behalf of the pension fund, there is no doubt that a fiduciary having such "dual loyalty" must act solely to benefit participants and beneficiaries. However, it is the Court's opinion here that when a corporate employer negotiates the terms of sale of a division, whose employees are participants in a pension plan, the negotiations that affect the terms and conditions of future pension benefits (at least those that are not protected by ERISA's vesting and non-forfeitability provisions), do not implicate fiduciary duties as to the pension fund. Such negotiations are distinct from actually administering a plan and conducting transactions affecting the monies and property of the plan's fund. In other words, the mere fact that a company has named itself as pension plan administrator, fiduciary, or trustee does not restrict

it from pursuing reasonable business behavior in negotiations concerning pension benefits not otherwise affected by the requirements of ERISA. *See N.L.R.B. v. Amax Coal Co.,* 453 U.S. 322, 333 n. 16, 101 S.Ct. 2789, 2796 n. 16, 69 L.Ed.2d 672 (1981).[2]

■ Even if a fiduciary duty were to be imposed on a corporate employer in a situation such as is now presented, the Court would be bound to conclude that no duty was violated here. The Court earlier concluded that the proposed amendments do not deprive any Plaintiff of a vested or non-forfeitable benefit. The Court also concluded the amendments proposed are reasonable under the circumstances. Finally, the Court would conclude that since all employees of the Weirton Division (not just the salaried, non-union plaintiffs) would be equally affected by the proposed changes, there is no discrimination. On the facts presented here, the action of National Steel in negotiating the terms of sale that affect ancillary pension benefits was neither arbitrary nor capricious. There has not been a showing of bad faith.

In conclusion, the Court finds that the terms of sale proposed to amend the pension program for salaried, non-union personnel at Weirton do not violate provisions of ERISA relating to prohibited transactions; do not violate provisions of ERISA relating to fiduciary duties upon National Steel; do not violate provisions of ERISA relating to vested, accrued benefits, or non-forfeitability, and do not conflict with provisions of the existing pension plan.

SEVERANCE PAY ISSUES

■ According to National Steel's policy on termination of exempt, salaried Weirton Division employees (See affidavit of John A. McCreary, given on June 21, 1983, with attached Exhibit), severance pay is made available to those who are discharged from employment only if the circumstances surrounding the termination meet certain criteria. Those who are separated from employment with National Steel because of resignation; dismissal due to misconduct or failure to maintain appropriate work performance standards; or because of quitting without notice or absence from work for five days without notice are not entitled to any severance pay allowance. The heir or other beneficiary of a salaried, non-union employee who dies is entitled to receive salary to the end of the current month and all vacation pay due. However, those who are separated from employment because a salaried exempt position has been terminated or due to reductions in the salaried exempt work force are said to be terminated under honorable circumstances and entitled to severance pay that varies with the length of service of the individual.

The policy on severance pay has been in force since September, 1979. Revisions were made in 1980, 1981, and 1982, but did not substantively change eligibility for severance pay benefits. In accordance with the terms of sale, National again amended its termination policy for exempt salaried personnel at Weirton on April 4, 1983, to provide that the sale of the Weirton Division assets will not entitle such persons to severance benefits.

In general, a severance allowance is payment by an employer to an employee on termination of the employee's employment. Black's Law Dictionary, 1232 (5th ed. 1979). Such payment is beyond wages and is usually designed to ease the employee's financial burdens while looking for new employment. *See Owens v. Press Publishing Co.,* 20 N.J. 537, 120 A.2d 442 (1956).

Though not a retirement benefit, severance pay does come within the reach of ERISA as an "employee welfare benefit

---

2. As earlier mentioned, the corporate pension plan specifies that the pension program is administered by a committee of designated National employees and that most of the assets of the plan are held by a trust fund, managed and held by a separate entity. It has occurred to the Court that since the people actually administering the pension fund may not be at all involved in the negotiations for the sale of the Weirton Division, no breach of fiduciary duty under 29 U.S.C. § 1104 would arise because of a division of labor within the corporation. However, the issues before the Court were framed to test National's participation in the events surrounding the proposed sale as a corporate entity.

plan." 29 U.S.C. §§ 1002(1) (citing 29 U.S.C. § 186 and the benefits described therein), 1002(2)(B). The "vesting" or "accrued benefit" provisions of ERISA (which mainly apply to pension plans) do not apply to severance pay benefits plans in general, *Calhoun v. Falstaff Brewing Co.,* 478 F.Supp. 357, 360 (E.D.Mo.1979), and do not apply to the severance pay provisions of the policy in issue here in particular.

Federal courts frequently look to the language of severance pay policies as a guide in determining whether violations have occurred. *See, e.g., Donnelly v. Aetna Life Ins. Co.,* 465 F.Supp. 696 (E.D.Pa.1979). The version of the termination policy, in effect immediately before any amendment was made to reflect the terms of sale, was promulgated December 31, 1982. The pre-amendment purpose of the policy was said to be:

> 2.1 It is the intent of the Weirton Steel Division to provide continuous employment to all exempt salaried employees. However, conditions may arise which necessitate the dismissal of an individual or a permanent decrease in the work force. It is the purpose of this policy to provide an equitable measure of compensation for eligible individuals whose employment has been terminated by the Company under honorable circumstances and to encourage management personnel to take prompt action whenever an individual lacks the ability to perform the duties of the position satisfactorily.

The purpose has not been substantively modified since the termination policy was initially announced in 1979. From an examination of the overall purpose of the policy and the definition of termination under honorable circumstances (the only type of discharge giving rise to severance pay benefits), the Court concludes that severance pay at National's Weirton Division is compensation granted in lieu of continuous employment to aid those terminated without fault of the employee.

In large measure, the reasoning of the Court with regard to prohibited transactions and other fiduciary duties of National Steel under ERISA for pension benefit issues apply equally to severance pay issues. Because no activity affecting the fiscal assets of a welfare benefit plan is implicated with the proposed amendments to severance allowance provisions in the agreement, 29 U.S.C. § 1106 (prohibited transactions) cannot apply. Indeed, the funding requirements of ERISA do not apply to employee welfare benefits plans such as a severance pay benefit, 29 U.S.C. § 1081, and there is no "fund" or group of assets subject to the prohibited transaction provisions. Because severance pay benefits are not subject to ERISA's vesting and non-forfeitability requirements, there can be no breach of fiduciary duty on the part of any party for proposing a limit to such benefits on the basis that some "vested" right is curtailed. The distinction between a corporate fiduciary duty when administering a benefit plan and corporate activities in connection with negotiating changes in a benefit plan which were enunciated with regard to pension issues is applicable to this discussion of severance pay benefits. Therefore, there has been no violation of an ERISA-based fiduciary duty with regard to the proposed severance pay amendment.

The Court is also satisfied that the amendment to the personnel policy controlling termination of non-union, salaried employees to preclude severance benefits solely on the basis of the transfer of ownership of the Weirton Division is reasonable and does not violate the preamendment terms of the policy. Simply put, the fundamental bases for this benefit are not necessarily put into play by such a transfer of ownership; namely, the permanent abolishment of positions or reductions in the salaried work force.

The Court earlier found that all, or a substantial majority of all, the active employees of National's Weirton Division will be offered an opportunity to work for the proposed employee-owned company. No discontinuity of employment is expected for

anyone (except those who choose to quit or retire). It can be said with certainty that any salaried, non-union employee of National Steel who becomes employed by the new employer following the transition of ownership is not entitled to a severance allowance under the termination policy or under ERISA. *Pinto v. Zenith Radio Corp.*, 480 F.Supp. 361 (N.D.Ill.1979), *aff'd*, 618 F.2d 110 (7th Cir.1980) (table). Also, the agreement in principle containing the terms of sale from National Steel states that National will remain liable for outstanding and unrevealed severance pay claims. To say that any individual employee of National at Weirton will have a valid severance pay claim that will be denied is purely speculative and it cannot be said that any existing Plaintiff would be a proper party to such a claim. (This motion for summary judgment only tests the proposed terms of sale and their effect on salaried, non-union personnel as a group.)

In conclusion, the Court finds that the terms of sale relating to severance pay and the correlated amendment to National Steel's policy on termination of exempt, salaried Weirton Division employees do not violate provisions of ERISA relating to prohibited transactions; do not violate provisions of ERISA relating to fiduciary duties; do not violate provisions of ERISA relating to vested, accrued benefits or non-forfeitable benefits, and do not violate provisions of the existing policy on severance pay for salaried, non-union personnel.

## THE MOTION TO DELAY CONSIDERATION

Counsel for Plaintiffs in this case have filed a motion to delay consideration of National's motion for partial summary judgment until further discovery is completed. The motion and accompanying discovery documents filed would indicate Plaintiffs' desire to explore the motivations of National Steel to bolster the alleged ERISA-based prohibited transaction and fiduciary duty claims of the complaint.

As earlier mentioned, in furtherance of its desire for expedited decision on the issues presented in the motion for summary judgment, Defendant National has conceded all of the claims of Plaintiff with regard to motivation and intent (for the purposes of this motion only).

Because the Court's ruling on National's motion for summary judgment is limited to issues surrounding the agreement in principle on terms of sale between National and a proposed, employee-owned company; and because the Court has considered Plaintiff's characterization of National's motivation for sale of the Weirton Division as true, there is no need to delay a ruling on the issues as framed. Accordingly, it is the opinion of the Court that Plaintiffs' motion for delay must be denied in large measure.

Since there are other issues raised by the complaint, not reached in today's ruling, further discovery may be necessary as to the undecided questions of this litigation. Provided the discovery is accomplished within the framework established by the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff's motion will be granted only in part as suggested.

## THE UNION MOTIONS TO DISMISS

Defendant Independent Steelworkers Union has moved to dismiss Plaintiffs' first cause of action for failure to state a claim upon which relief can be granted. Plaintiffs have not opposed the motion. A claim should not be dismissed under Rule 12(b)(6), Federal Rules of Civil Procedure, unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *McLain v. Real Estate Board*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). *Conley v. Gibson*, 355 U.S. 41, 45–56, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

█ The Union is not specifically named in the first cause of action of the complaint. A fair reading of this portion of the complaint reveals Plaintiff attempts to state a cause of action under ERISA. Allegations are stated concerning the Plaintiffs' eligibility for employee welfare benefit plans, and concerning the administration of such plans. Those persons responsible for the administration and management of pension

and welfare benefit funds are generally proper defendants in suits charging ERISA violations. *Boyer v. J.A. Majors Emp. Profit Sharing Plan,* 481 F.Supp. 454 (N.D.Ga. 1979). It is not alleged, however, that Defendant Union has any formal connection with the employee welfare benefit plans for salaried, non-union personnel at the Weirton Division, nor has there been any evidence that would infer such a connection. Indeed, any nexus between these Plaintiffs and the Independent Steelworkers Union would appear to be remote, at best.

Because Plaintiffs have not specifically named Defendant Union in the first cause of action; because the Union may not be a proper party to an ERISA-based claim by these Plaintiffs; because the connection between the Union and these Plaintiffs is remote, and because there has been no response or opposition to the motion, it is the opinion of the Court that the Union's motion to dismiss the first cause of action for failure to state a claim must be granted.

As to the second cause of action in the complaint, Defendant Union urges that the Court lacks subject matter jurisdiction over the numerous claims therein. Whenever it appears that a federal court lacks subject matter jurisdiction, the action or claims must be dismissed. *Trent Rlty. Assoc. v. First Fed. Sav. & Loan Assoc.,* 657 F.2d 29, 36 (3rd Cir.1981).

The second cause of action in the complaint alleges that "(j)urisdiction of this Court . . . is retained and invoked pursuant to the pendent jurisdiction of this Court." Among the thirty paragraphs in the second cause of action are references to the West Virginia Labor-Management Relations Act, W.Va.Code §§ 21–1A–1, et seq., the public policy of the State of West Virginia, and a claim of mental anguish and emotional and physical distress. Although several federal statutes are also cited in the second cause of action, the Court presumes the above-listed three areas are the aspects of the cause of action to which Plaintiffs refer when they seek to invoke the Court's pendent jurisdiction.

In general terms, the doctrine of pendent jurisdiction allows a federal district court, cloaked with subject matter jurisdiction over one or more of a plaintiff's claims, to take jurisdiction of another of plaintiff's claims although there is no independent basis of federal jurisdiction. Since complete diversity does not exist between Plaintiffs and either defendant in the instant action, the Court must presume Plaintiffs' theory is that federal question jurisdiction exists as to some claim against Defendant Union and that the three areas of State law earlier set forth forms the basis of additional claims against the Union. However, the Court has dismissed the ERISA-based first cause of action (as to the Union) for failure to state a claim. In the present posture of this litigation, it would appear that Plaintiffs seek to assert State law claims against this Defendant without asserting a viable federal law claim. Even assuming the ERISA-based claims are viable as to the co-defendant, National, such an extension of subject matter jurisdiction should be undertaken with extreme caution. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

In any case, the doctrine of pendent jurisdiction is a matter of discretion, not of plaintiff's right. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). With due consideration to judicial economy, convenience, and fairness to the litigants, the Court is of the opinion that pendent jurisdiction should not be invoked against Defendant Union in this civil action. Without the pendent claims of the second cause of action, Defendant Union would not be a party to this litigation since it is not specifically named in the only other cause of action in the complaint. In consideration of today's ruling on Defendant National Steel's partial summary judgment motion, it must be said that as to any Defendant, the pendent, State-law claims predominate the remaining issues in this litigation. If there was a substantial federal question foundation on which to pend State-law claims, it has been considerably diminished by partial summary judgment in favor of

National. The Court does not believe it would be fair to require the Union to defend the claims of the second cause of action given the remote connection, if any, between these Plaintiffs (non-union employees) and the Independent Steelworkers Union.

The second cause of action of the complaint is drafted in a broad and ranging manner, making delineation and interpretation of the claims presented somewhat difficult for the Court and the answering parties. Since the second cause of action is quite similar in nature to that of the complaint and amended complaint in the *Sutton* litigation, it is felt it would be fair to note that deficiencies of pleading have been pointed out both in open court (by the Court and counsel) and in documents of record in the case file. Counsel for Plaintiffs has not seen fit to rectify the deficiencies in an effective manner. *Cf.* Plaintiff's Submission of Issues, filed May 20, 1983. It must also be noted that counsel for Plaintiffs has not indicated opposition or other response to the motion under consideration.

Even though the first paragraph of the second cause of action of the complaint would tend to infer that only matters of pendent jurisdiction will be alleged in the following paragraphs, there are some claims which might be interpreted as stating claims under federal law. For example, Plaintiffs allege that the Union (with co-defendant National Steel) has "breached in bad faith" the express provisions of ERISA. Complaint § 81. Because the Plaintiffs are not members of Defendant Union (or any union) and because it appears there is no formal connection between Defendant Union and the pension plan in issue, it would appear that fairness to the parties requires that the inference of federal claims in the second cause of action be ignored. Perhaps the failure of Plaintiffs to respond to the Union's motion requires such treatment. *McNutt v. General Motors Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936). *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979).

In conclusion, the Court finds that Defendant Union is not a proper party to the second cause of action as stated in the complaint.

ORDER

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure. Upon the reasoning and conclusions herein, it is

ORDERED that the motion of Defendant National Steel Corporation for partial summary judgment on the issues earlier delineated is GRANTED. It is

ORDERED that the motion of Plaintiffs' to delay consideration of National's motion for summary judgment is DENIED in part, and GRANTED in part, as earlier delineated. It is further

ORDERED that the motion to dismiss of Defendant Union pursuant to Rule 12(b), Federal Rules of Civil Procedure, is GRANTED; that Defendant Independent Steelworkers Union be dismissed as a party, and that the style of this civil action be changed to reflect the dismissal.

There are other issues raised and suggested by the complaint which are not resolved to date. The Court will look to counsel for the various parties to begin proceedings which will mature these matters for speedy disposition.