Rickey B. and Brenda S. BRYANT,
et al., Plaintiffs,

v.

FOOD LION, INC., et al., Defendants.

Civ. A. No. 2–90–0505–1.

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 4, 1991.

· James Lee Bell, Columbia, S.C., Nicholas W. Clark, UFCW, Legal Dept., Ian Lanoff, and Julia Penny Clark, Washington, D.C., for plaintiffs.

Robert W. Dibble, Jr., Charles S. Porter, Jr., David J. Mills, McNair Law Firm, Columbia, S.C., Patrick Michael Duffy, McNair Law Firm, Charleston, S.C., for Food Lion, Inc.

Ashley Bryan Abel, Samuel Franklin Painter, Richard Kent Porth, Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C., for The Food Lion, Inc. Profit Sharing Plan and Trust [and] The Food Lion, Inc. Group Benefit Plan and Trust.

Wade H. Logan, III, Cody Walker Smith, John Allen Massalon, Holmes & Thomson, Charleston, S.C., for Ralph W. Ketner, Tome E. Smith, Eugene R. McKinley [and] John Does.

HAWKINS, Chief Judge.

This matter is before the court on several motions raised by the parties. The defendants have moved for partial summary judgment and for a denial of class certification. The plaintiffs have moved to have an order by the magistrate judge set aside. Briefs were submitted by the parties and arguments were heard at hearing held on May 21, 1991.

## I. FACTS

The Court begins with the facts that are not in dispute. Food Lion, the owner and operator of a chain of supermarkets throughout the Southeast, sponsors a profit sharing plan for its employees ("Profit Sharing Plan" or "Plan"). The structure and operation of the Plan is regulated by ERISA. *See* 29 U.S.C. §§ 1002(2)(A), 1003(a)(1). Under the terms of the formal plan instrument, Food Lion also serves as the plan administrator.

Each year Food Lion contributes a portion of its profits to the Plan. The amount of contributions is determined annually by the Food Lion Board of Directors. The Plan is entirely employer-funded; employee contributions are not allowed. All assets of the Plan are held in trust. Over 28,000 of Food Lion's approximately 40,000 employees participate in the Profit Sharing Plan. The Plan has received a determination letter from the Internal Revenue Service confirming that its terms conform to the qualification rules of the Internal Revenue Code.[1]

Individual defendants Ketner, Smith, and McKinley are current or former officers of Food Lion, and Ketner and Smith sit on Food Lion's Board of Directors. Each of them is or was a trustee of the Profit Sharing Plan, and each of them is or was a member of the Food Lion Profit Sharing Committee. The Profit Sharing Committee is a Committee whose members are appointed by the Food Lion Board to oversee the administration of the Profit Sharing Plan on behalf of Food Lion. Defendants concede that in their role as trustees and in administering the Profit Sharing Plan, Ketner, Smith, and McKinley were fiduciaries of the Profit Sharing Plan as that term is defined in ERISA. *See* 29 U.S.C. § 1002(21)(A).

Each employee who participates in the Plan has an individual account established to calculate his benefits. The total amount of benefits in a participant's individual account at any given time is a function of three factors: (1) the portion of the annual employer contributions, if any, that has been allocated to the participant's account; (2) the portion of the annual income earned on the total assets of the Plan that has been allocated to the participant's account; and (3) the portion of annual forfeitures that have been allocated to the participant's account. It is the issue of forfeitures that is at the heart of the plaintiffs' claims concerning the Profit Sharing Plan.

The Profit Sharing Plan, like many pension plans, contains a vesting schedule. A pension plan's vesting schedule establishes the percentage of earned pension benefits that are nonforfeitable at any given point during an employee's service with the plan

---

1. The parties dispute, however, whether in actual operation the Plan conforms with the qualification rules of the Internal Revenue Code.

sponsor. Until 1988, the terms of the Profit Sharing Plan imposed a 5-to-15 year, or graduated, vesting schedule.

Under the 5-to-15 year schedule, after five years of employment with Food Lion a participant would have a nonforfeitable right to 25 percent of the amount in his individual account, that is to say, he would be 25 percent vested. Thus, if an employee worked five years at Food Lion and thereupon terminated his employment without having reached retirement age, he would be entitled to 25 percent of the monies in his individual pension account. But if he remained at Food Lion, then upon the completion of each year of service beyond five years an additional amount would vest and after 15 years of service he would be 100 percent vested in his individual account balance.

Food Lion's choice of the 5-to-15 year vesting schedule was specifically endorsed by ERISA. Until 1986, section 203(a) of ERISA, 29 U.S.C. § 1053(a), required employers to choose one of three alternative vesting schedules when designing the terms of a pension plan, or a schedule at least as generous. The 5-to-15 year vesting schedule was specifically authorized in section 203(a)(2)(B) of ERISA, 29 U.S.C. § 1053(a)(2)(B) (1986).

The Tax Reform Act of 1986 amended ERISA's vesting standards to require employers to provide a vesting schedule at least as favorable as one of two alternative schedules, the so-called "5-year cliff" vesting schedule or the "7-year graduated" vesting schedule. 29 U.S.C. § 1053(a)(2)(A), (a)(2)(B). In 1988 Food Lion amended the Profit Sharing Plan to adopt the 5-year cliff vesting schedule. Under this schedule, which became effective in December 1988, a participant becomes 100 percent vested in his account balance upon the completion of 5 years of service with Food Lion. Prior to 5 years of service, he is not entitled to any of his account balance.

Thus, under the current Plan rules, if an employee works at Food Lion for five years and accrues a $10,000 balance in his account, and thereafter terminates employment, he will receive all $10,000. Under the former 5-to-15 year regime, he would have received only 25 percent, or $2500.

Whenever a participant's employment ceases, however, the portion of the participant's individual account that is not vested is forfeited. The Internal Revenue Code and the regulations thereunder require forfeitures to be handled differently depending upon the type of pension plan at issue. In a profit sharing pension plan like Food Lion's, the company must reallocate the forfeited amounts to all remaining participants in the Plan, thus further rewarding long-term service. *See* Treas.Reg. §§ 1.401–1(b)(1)(i), –1(b)(1)(ii), and 1.401–7; *see also* IRS Rev.Rul. 71–313, 1971–2 C.B. 203.

It is at this juncture that the litigants part company on the facts. The plaintiffs assert, which for purposes of the instant motion the Court must accept as true, that only "a small fraction" of the Food Lion employees who participate in the Plan worked long enough to vest under the old 5-to-15 year vesting regime. They contend that the individual defendants were aware of and condoned this effect, because their own Profit Sharing Plan accounts grew by the receipt of a portion of each of the forfeitures generated by those employees who terminated employment before fully vesting.

Moreover, plaintiffs contend that 5-year cliff vesting did not correct the problem. They assert that "relatively few employees are Plan participants for five years or longer," and that Food Lion and the individual defendants chose this schedule because "it was predicted to result in fewer participants generally vesting, and greater sums being forfeited to other participants' accounts."

Under sections 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), fiduciaries are required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," and are required to act "for the exclusive purpose of providing benefits to participants and benefi-

ciaries." Plaintiffs argue that by "maintaining unduly restrictive vesting schedules that assured that the large majority of Plan participants would receive little or no benefit" the individual defendants violated section 404 of ERISA. Plaintiffs further argue that the increase in the individual defendants' own Profit Sharing Plan accounts by virtue of the forfeitures resulted in prohibited transactions under sections 406(a)(1)(D) and (b)(1) and (b)(2) of ERISA.

Separate from their attack on the defendants for designing and maintaining purportedly "restrictive" vesting schedules, the plaintiffs contend that Food Lion and the individual defendants also "engaged in a continuous, systematic scheme to prevent Plan participants from vesting ... and to maximize forfeitures by terminating their employment, pressuring them to quit prior to vesting, ... or otherwise discriminating against them." Thus, plaintiffs contend that the individual defendants, aside from designing and maintaining inherently restrictive vesting rules, also manipulated the employment status of Food Lion employees in order to prevent their attainment of vesting and to generate additional forfeiture monies for the Food Lion hierarchy. Section 510 of ERISA, 29 U.S.C. § 1140, prohibits a person from, *inter alia,* discharging, suspending, disciplining or discriminating against a plan participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." Plaintiffs claim that the alleged employment discrimination by the defendants violates section 510 of ERISA. That claim, however, is not a part of the summary judgment motion currently before the Court.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The allegations in this case focus on the structure and operation of several employee benefits plans that defendant Food Lion, Inc. sponsors for its employees. Currently

before the Court is defendants' motion for partial summary judgment on Counts I, II, and III of Plaintiffs' Second Amended Complaint,[2] which allege that the individual defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), with respect to the vesting rules of the Food Lion, Inc. Profit Sharing Plan. For the reasons discussed below, the motion is granted.

### A. *The Standard of Review*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is required "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," show that there is no genuine issue of fact material to resolution of the underlying legal issue, and if, in light of the uncontroverted material facts, the moving party is entitled to judgment on that legal question. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Defendants' summary judgment motion is based almost entirely upon the pleadings, as well as on several exhibits, specifically, excerpts from the formal Profit Sharing Plan document and a letter from the Internal Revenue Service stating that the terms of the Plan conform with certain provisions of the Internal Revenue Code. These exhibits do not dispute the allegations in the pleadings, but supplement the factual record before the Court on the motion.

Accordingly, the motion is functionally similar to a motion to dismiss for failure to state a claim under Rule 12(b)(6), or to a motion for judgment on the pleadings under Rule 12(c). *See Dyal v. Union Bag–Camp Paper Corp.,* 263 F.2d 387, 391 (5th Cir.1959) (summary judgment motion based on pleadings and exhibits). The Court must presume all factual allegations in the Second Amended Complaint to be true, and must make all reasonable inferences in fa-

---

**2.** Specifically, the defendants seek partial summary judgment as to paragraphs 40, 42, 50, 51,

52(g) and 64 through 71.

vor of the plaintiffs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Miller v. Federal Deposit Insurance Corporation*, 906 F.2d 972, 74 (4th Cir.1990). The Court, however, will not give a presumption of truthfulness to legal conclusions, deductions, or opinions that are couched as factual allegations. *See Johnson v. Wells*, 566 F.2d 1016 (5th Cir.1978); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

■ In the context of a summary judgment motion which, like that of the defendants, is based largely upon the pleadings, the motion should be granted if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), or if it appears that further "inquiry into the facts is not desirable to clarify the application of the law." *Miller v. Federal Deposit Insurance Corporation, supra*, 906 F.2d at 974; *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950). In such circumstances summary judgment avoids fruitless discovery expense, and prevents an unnecessary delay in the trial of those issues where there is a genuine factual controversy. But if the Court can foresee a set of facts that will prove plaintiffs' claim, or if further discovery into the facts is needed in order to determine how the law should apply in this case, then summary judgment should be denied.

### B. *Analysis*

The Court begins its legal analysis by noting that in enacting ERISA Congress created specific rules on vesting, and Food Lion has complied with those rules. Prior to the Tax Reform Act of 1986, Food Lion

chose a 5-to-15 year vesting schedule specifically endorsed in section 203(a) of ERISA. *See* 29 U.S.C.A. § 1053(a) (1986). After the Tax Reform Act of 1986 amended section 203 of ERISA, *see* 29 U.S.C.A. § 1053(a)(2)(A), (a)(2)(B), Food Lion amended its Plan to again comply with the vesting schedule minimums created by Congress. The plaintiffs do not contend otherwise.

■ But the plaintiffs argue that satisfaction of the specific vesting rules of ERISA does not mean a pension plan's vesting provisions satisfy the statute. They assert that ERISA's fiduciary rules can require fiduciaries to adopt more generous vesting schedules than ERISA itself authorizes. They argue that if a person is a fiduciary because he administers a pension plan, he violates his fiduciary duties if he fails to alter vesting rules under which forfeitures are added to, among other participants, his own pension account.

Congress established minimum vesting standards in ERISA in order to set a range within which companies could exercise their business judgment and design a schedule that comported with their employee benefits philosophy. *See* H.R.Rep. No. 779, 93d Cong., 2d Sess., at 53 ("Your committee believes that the new vesting rules should provide flexibility, so as to allow plans to choose from several reasonable standards a vesting schedule best suited to the needs of the particular business").[3]

If Congress had wanted to additionally constrain the design of a vesting schedule it could have so indicated in either section 203 of ERISA or ERISA's fiduciary provisions. Yet, it did not. As the Supreme Court stated in *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985), although ERISA is a remedial statute it is also a "comprehensive and reticulated"

---

**3.** During debate on the House floor regarding the Conference Bill that became ERISA, Representative Schneebeli made the following statement:

The idea of having three separate vesting schedules is to allow employers and employees to choose one which most conforms with

their particular situation and is designed to provide the kind of flexibility that the conferees felt was necessary in the establishment of new standards for pension plans.

120 Cong.Rec. H8708 (daily ed. Aug. 20, 1974) (Statement of Rep. Schneebeli).

law, and Congress' careful drafting should not be overridden by implying unstated rules and remedies.[4]

█ It is now well established, both by this Court and elsewhere, that not every decision affecting a pension plan made by an employer, and by the officers who act for that employer, is subject to ERISA's fiduciary rules. The ERISA definition of a fiduciary, 29 U.S.C.A. § 1002(21)(A), as well as ERISA's rules that govern fiduciary conduct, 29 U.S.C.A. § 1104(a)(1), make clear that only actions respecting the actual administration of a plan or management of plan assets are subject to the fiduciary rules. *Dzinglski v. Weirton Steel Corp.,* 875 F.2d 1075, 1079 (4th Cir.1989).

Decisions respecting whether to offer a pension plan in the first place and what benefit features a plan should have are not matters of plan administration or pension asset management, but rather relate to the design and sponsorship of the plan. They are expressions of company personnel policy made in the exercise of the employer's management prerogative. As this Court recognized in *Crosswhite v. E.I. DuPont De Nemours & Company,* CA 87–158 (D.S.C. Oct. 14, 1988), *aff'd without opinion,* 896 F.2d 1366 (4th Cir.1990), such decisions are *settlor* acts, not fiduciary acts, and are immune from scrutiny under ERISA's fiduciary standards.[5]

4. Although plaintiffs' Second Amended Complaint does not assert a violation of ERISA section 203, their opposition papers contend that the Profit Sharing Plan does violate that provision. Analogizing from similar provisions of the Internal Revenue Code, plaintiffs argue that section 203's minimum vesting requirements should be read to imply a further requirement that vesting rules not discriminate in favor of highly compensated employees (the so-called "anti-discrimination rule"), and they contend that in operation the Food Lion Plan violates this anti-discrimination rule.

In order to foster the maintenance of pension plans, the Internal Revenue Code provides tax advantages to employers whose pension plans satisfy certain design standards. The Code's rules governing how vesting schedules must be designed are contained in section 411 of the Code. Subsection 411(d)(1) provides that a pension plan's vesting rules must, among other things, satisfy the anti-discrimination rule of section 401(a)(4) of the Code. But while much of section 411 of the Code is also found in section 203 of ERISA, the anti-discrimination requirement of section 411(d)(1) is *not* replicated in section 203 of ERISA. Nowhere in ERISA does Congress state that a plan's vesting rules must satisfy an anti-discrimination requirement. Since Congress made clear in the Internal Revenue Code that it wanted the anti-discrimination requirement to apply to the Code's rules on vesting, its failure to specify an anti-discrimination requirement in section 203 of ERISA is a telling admission. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983). This Court is reluctant to imply a specific substantive duty in a statute as carefully reticulated as ERISA without clear evidence of Congress' intent that it imply precisely such an obligation. That evidence has not been found.

Nor does it matter that the Treasury Department has promulgated regulations which inter-

pret section 411 of the Code to require that a plan's vesting rules not discriminate. Those regulations interpret the very part of section 411—subsection 411(d)(1)—that does not appear in section 203 of ERISA. It would be illogical and unwarranted for this Court, in interpreting ERISA, to give effect to an agency regulation that interprets a provision of law that does not exist in ERISA.

Given this Court's view that Congress did not intend to include in ERISA a rule prohibiting discrimination in favor of the highly compensated, plaintiffs' pursuit of this point would require the Court in essence to grant standing to a private party to enforce the Internal Revenue Code. *Reklau v. Merchants National Corporation,* 808 F.2d 628, 631 (7th Cir.1986), *cert. denied,* 481 U.S. 1049, 107 S.Ct. 2180, 95 L.Ed.2d 836 (1987). But only the Internal Revenue Service may enforce the Code. *See* I.R.C. § 6201(a).

5. *See Dzinglski v. Weirton Steel Co.,* 875 F.2d 1075, 1080 (4th Cir.1989); *Landry v. Air Line Pilots Ass'n Intern'l, AFL–CIO,* 901 F.2d 404, 414 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Sejman v. Warner–Lambert Co. Inc.,* 889 F.2d 1346, 1349 (4th Cir. 1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); *Musto v. American General Corp.,* 861 F.2d 897, 911–12 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Dhayer v. Weirton Steel Division of Nat'l Steel Corp.,* 571 F.Supp. 316, 328 (N.D.W.Va.1983), *aff'd sub nom., Sutton v. Weirton Steel Div. of Nat'l Steel Corp.,* 724 F.2d 406, 411 (4th Cir.1983), *cert denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). *See also* Department of Labor Op. letter to John N. Erlenborn, 13 Pens.Rep. (BNA) 472 (March 13, 1986) ("there is a class of discretionary activities which relate to the formation, rather than to the management, of plans. These so-called 'settlor' functions include decisions relating to the estab-

■ Furthermore, just because the same individuals who design the features of a pension plan also participate in the ongoing administration of the plan does not mean that their design decisions are to be tested by the fiduciary standards of ERISA. ERISA expressly contemplates that a person can serve as a fiduciary "in addition to being an officer, employee, or agent" of the company that sponsors the plan. 29 U.S.C. § 1108(c)(3). When a company officer wears his settlor "hat," that does not automatically mean he also wears his fiduciary "hat." *See Bidwill v. NFL Management Council,* 943 F.2d 498, 508–09 (4th Cir.1991); *see Crosswhite,* Slip. Op. at 13; *see also Dzinglski,* 875 F.2d at 1078; *Landry v. Air Line Pilots Ass'n Int'l, AFL–CIO, supra,* 901 F.2d at 414; *Sejman v. Warner–Lambert Co., supra,* 889 F.2d at 1349; Dept. of Labor Reg. § 2509.75–8, D–4, 29 C.F.R. § 2509.75–8, D–4 (a person who is a fiduciary for some purposes is not a fiduciary with respect to all acts that affect the plan).

The key question is, what role are the individuals playing at the time of the contested act: are they undertaking a plan design decision in the exercise of their company's business prerogatives, or are they undertaking a fiduciary decision in their capacity as administrators of the pension plan? That is the single, crucial legal issue currently before the Court: Is the choice of a vesting schedule a settlor decision or a fiduciary one?

This Court believes that the choice of a vesting schedule is a plan design decision that an employer makes as a settlor. Put simply, a vesting schedule determines how benefits are to be allocated among participants and beneficiaries. Provisions closely analogous to vesting rules are often found in a will or trust. It would not be uncommon for a will to provide that a person shall receive a sum of money if he performs a particular task, or that a person receives a certain percentage of an estate asset upon completion of a particular term of service. That type of provision is made by the creator of the will or trust—the settlor—and it is made as part of his or her design of the features of the trust, consistent with his wishes on how to disseminate the assets he puts into the trust.

Similarly, when an employer (and the employees who act for it) selects a vesting schedule, it is acting in its capacity as creator of the pension trust, and it makes that decision consistent with its wishes for how the assets it will place into the pension trust should be disseminated. The choice of a vesting schedule is an inherently settlor function. It is a predicate to pension plan administration and does not implicate any fiduciary obligation.[6]

In *Crosswhite,* this Court adopted the test set forth in *Ogden v. Michigan Bell Telephone Co.,* 657 F.Supp. 328, 335 (E.D.Mich.1987), *rev'd on other grounds,* 858 F.2d 1154 (6th Cir.1988), to determine whether conduct is undertaken in a fiduci-

---

lishment, termination and design of plans and are not fiduciary activities subject to Title I of ERISA.")

**6.** Plaintiffs cite *Phillips v. Alaska Hotel and Restaurant Employees Pension Fund,* 11 Empl.Ben. Cases (BNA) 1929 (W.D.Wash.1989) *rev'd,* 944 F.2d 509 (9th Cir.1991) for the proposition that trustees, acting as such, may alter vesting rules, and have a fiduciary duty to maintain a vesting schedule that serves the interests of all plan participants. Although the Ninth Circuit acknowledged that "a structural defect action may be maintained under § 302(c)(5) of the LMRA and a breach of fiduciary duty claim may be maintained under § 404 of ERISA notwithstaingg a plan's compliance with minimum ERISA vesting requirement," the court upheld the vesting requirments set forth by the trustees. In any event, *Phillips* is not applicable to this case.

In *Phillips,* the plan settlors were a union and an employer association, and rather than design the vesting schedule, they delegated that function to the plan trustees. *Id.* at 1930. However, it is uncontroverted that Food Lion made no such delegation. The Food Lion Plan specifically sets forth what the vesting schedule will be. It does not delegate to the trustees or plan administrator the authority to determine the vesting rules. Further, both the Plan as in existence between 1984 through 1988, as well as the version of the Plan currently in existence, expressly provide that only Food Lion, acting through its Board of Directors, and not the trustees or plan administrator, may amend the terms of the Plan. Because the defendants, acting as trustees, are expressly denied the authority to amend the Plan and change its vesting schedule, they could not have any fiduciary obligation to do so.

ary capacity. Under *Ogden,* if "a neutral third party, such as a bank [or outside trustee or administrator], could have made the challenged decision," then the decision will be deemed to be fiduciary in nature. Here, if a neutral third party were to serve as administrator or trustee of the Plan, it clearly would not be empowered to alter the Plan's vesting provisions, because under the Plan's terms Food Lion acting through its Board of Directors has reserved the right to make any amendments.

Furthermore, if a neutral third party were to make the vesting schedule decision it would be "improperly interfering in the company's business activities." *Crosswhite,* Slip. Op. at 14. Corporate planning considerations are inherent in the choice of a vesting schedule. Some companies choose liberal vesting rules in order to attract needed employees. Other companies determine that relatively longer vesting rules which encourage long-term service or reward senior management are a more appropriate pension benefits philosophy. These considerations, inherent in the vesting decision, are emblematic of a classic corporate planning decision.

The plaintiffs stress that this case is different because each individual defendant participates in and is fully vested in the Plan. As a result, say plaintiffs, the individual defendants have a conflict between their personal interest in establishing and maintaining a conservative vesting schedule, which generates forfeitures of non-vested monies and increases their individual pension accounts, and the interests of all plan participants in obtaining a "meaningful pension."

Plaintiffs assert that the central motivation underlying the individual defendants' vesting schedule decision was their own self-interest, and that they chose the vesting schedule not for any legitimate business reason, but "as an engine" to direct plan assets into the pension accounts of the Food Lion hierarchy. Plaintiffs strenuously argue that they must have discovery in order to demonstrate the truthfulness of these assertions, and they assert that if

proved such conduct constitutes a violation of ERISA's fiduciary duty of loyalty.

There are always potentially competing concerns between the designers of a pension plan and the interests of pension plan participants in pension benefits. In some instances that competition may be between senior management's compensation interests and the interests of all participants in the largest possible pension. If these competing concerns give rise to a fiduciary duty, then the distinction that the law makes between settlor and fiduciary functions would be obliterated, and all corporate decisions affecting a pension plan would be treated as fiduciary acts. *See Dhayer v. Weirton Steel Division,* 571 F.Supp. 316, 326–29 (N.D.W.Va.1983).

■ Plaintiffs' argument places the cart before the horse. A party's motivation does not determine whether his action constitutes fiduciary conduct. *See Dhayer v. Weirton Steel Division, supra,* 571 F.Supp. at 328. It is the function served by the act, not the motivation for the act, that determines whether the act was performed in a fiduciary capacity. *See Leigh v. Engle,* 727 F.2d 113, 133 (7th Cir.1984); *Fulk v. Bagley,* 88 F.R.D. 153, 163 (M.D.N.C.1980).

If a party invests all the assets of a pension trust in junk bonds, but he does so for a pure motive, is that person free from scrutiny as a fiduciary even though the function performed is pension asset management? Undeniably not. Only after it is determined that the challenged act was performed in a fiduciary capacity does the motivation for the act become important. To examine motivation *ab initio* in order to determine whether a fiduciary duty existed is reversed.

The ERISA cases that plaintiffs cite to support their view that motivation is material are inapposite. These cases hold that whenever a person who has any responsibility as an ERISA fiduciary *exercises a fiduciary* function for his own self-interest or gain, such conduct will be scrutinized under fiduciary standards and a breach found. *See, e.g., Schaefer v. Arkansas Medical Society,* 853 F.2d 1487 (8th Cir.

1988); *In re Fairchild Industries Inc. and GMF Investments Inc.*, 768 F.Supp. 1528, 13 Empl. Ben. Cas. (BNA) 1690 (N.D. Fla. 1990), *In re Gulf Pension Litigation*, 764 F.Supp. 1149 (S.D. Tex.1991).

This legal principle is well-accepted [7] but it begs the question, for in these cases the courts either assumed, or found *ab initio* that the challenged conduct was a fiduciary act. It was only thereafter that the motivation for the act became material to the disposition of the fiduciary breach claim.

■ Whether senior management's motivation for the vesting schedule decision is self-interest or more benign, to impose ERISA's fiduciary requirements on that decision would yield unintended and absurd results. For example, if next year Food Lion were to decide to reduce dramatically its contribution to the Profit Sharing Plan because it wanted to use profits to pay management higher bonuses and its shareholders larger dividends, under plaintiffs' theory they would have a valid claim of breach of fiduciary duty: senior management would be held to have a conflict between its own compensation interests and the interests of participants in having greater pensions, and the decision to scale back contributions was made solely out of self-interest.[8] Taking plaintiffs' assertions at face value, as the Court must, the Court assumes that the underlying purpose behind Food Lion's vesting schedule decisions was to generate large profit sharing accounts for the top Food Lion management hierarchy. Regardless of what this Court's opinion may be of the propriety of this motivation, the law holds that the motivation of a plan settlor is not to be tested against fiduciary standards and is not subject to judicial second-guessing. Therefore, discovery is *not* needed to determine whether the individual defendants had a legitimate business reason for its vesting decision or a self-interested one. *See Dhayer v. Weirton Steel Division, supra*, 571 F.Supp. at 328.[9]

Implicit in plaintiffs' fervent assertions of defendants' self-interest is a plea that if their claim is dismissed an injustice will result. But the Court does not believe that dismissal of plaintiffs' claims respecting the vesting schedule will work a harsh re-

---

7. *See* 29 C.F.R. § 2550.408b–2(e).

8. If it is the personal gain generated by forfeitures that gives rise to the alleged conflict and creates a fiduciary duty to alter the vesting rules, which is also what plaintiffs contend, then all Food Lion would need to do to maintain the current vesting rules would be to hire a neutral third party to act as trustee and administer the plan. That trustee/administrator would not be eligible for any pension benefits from the plan, would therefore have no conflict of interest, and thus no fiduciary duty to alter the vesting schedule.

The Food Lion officers who maintained the Profit Sharing Plan's vesting schedule were following the express terms of the Plan, as they are presumptively required to do as fiduciaries. 29 U.S.C. § 1104(a)(1)(D). Neither they, nor an unaffiliated third party trustee/administrator acting in their place, could depart from the terms of the plan and, if they did, might have breached their fiduciary duty. *See Ershick v. United Missouri Bank*, 12 Empl. Ben. Cases (BNA) 2323, 1990 WL 126929 (D.Kan.1990).

9. An additional flaw in plaintiffs' argument that motivation is material is demonstrated if one assumes that the defendants had a legitimate business reason for their vesting decision. Assume that Food Lion's vesting schedule decision was made because defendants truly wanted to encourage long-term service and loyalty to Food Lion, and for no other reason. Yet section 404(a)(1)(A) of ERISA requires fiduciaries to act *"for the exclusive purpose of providing benefits* to participants and beneficiaries" of the plan (emphasis added). If the vesting schedule decision were a fiduciary act such motivation would compel a finding of fiduciary misconduct, because "legitimate" as the motivation may be, it benefits the long term interests of the company and is inconsistent with the duty to act for the exclusive purpose of providing all participants with benefits.

There is no allegation in this case that the individual defendants removed forfeited monies from the Plan trust and paid it to themselves or others, in any form. Furthermore, under the Internal Revenue Code the total amount of contributions *and* forfeitures than can be allocated to any individual participant's pension plan account in a given year is $30,000. I.R.C. § 415(c)(1). Plaintiffs do claim that two defendants, aside from the increases in their pension accounts from forfeitures, received compensation bonuses whose size was increased by the amount of forfeitures allocated to them. Assuming it is true, this may have added to their motivation to increase forfeitures, but it is irrelevant to whether the vesting decision constitutes fiduciary conduct.

sult. The gravamen of plaintiffs' claim is that the defendants "maintain[ed] unduly restrictive vesting schedules that *assured* that the large majority of Plan participants would receive little or no benefit from the Plan...." (Emphasis added.) To simply adopt a vesting schedule that is expressly approved in section 203 of ERISA appears to this Court to be a neutral act. By itself this adoption would not "assure" anything.

The type of conduct that would "assure" that very few Food Lion employees vest in their pension benefits would be for company management to implement employment policies precisely designed to terminate employees prior to vesting status. *See Gavalik v. Continental Can Co.*, 812 F.2d 834, 851–52 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). This is exactly what the plaintiffs allege in their claim under section 510 of ERISA. That claim is preserved notwithstanding a grant of the instant motion. To grant the motion simply avoids unnecessary discovery and litigation expense but preserves the thrust of the plaintiffs' Profit Sharing Plan attack.

## III. *DEFENDANTS' MOTION FOR DENIAL OF CLASS CERTIFICATION*

Defendants have filed a "Motion for Denial of Class Certification," in which they ask this Court to rule that the classes alleged in plaintiffs' Second Amended Complaint cannot, as a matter of law, be certified. The defendants filed the instant motion on February 14, 1991 prior to the time by which the plaintiffs were to file their motion for class certification pursuant to the scheduling orders issued by the magistrate judge.

Defendants ask, in other words, that the Court preemptively terminate the class aspects of this litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification. Defendants' contention is, in effect, that there is no set of facts plaintiffs could adduce under which they could meet the requirements for class certification of Rule 23 of the Federal Rules of Civil Procedure.

■ Therefore, this is is not the typical motion for class certification, in which the proponent of class certification has the burden of establishing that the requirements of Rule 23 are met. *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 n. 6 (4th Cir.1977) (en banc), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). Rather, the unusual procedural posture of this motion—in which defendants contend that certification is precluded as a matter of law—requires that the Court apply the standard applicable to a motion to dismiss under Rule 12(b)(6). Thus, to prevail, the defendants have the burden of demonstrating from the face of plaintiffs' complaint that it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove. The Court concludes, for the reasons set forth below, that defendants have failed to carry this heavy burden, and that their attempt to terminate the class-action aspect of this litigation is premature.

■ As a general matter, a ruling on class certification should normally be based on "more information than the complaint itself affords," *Doctor v. Seaboard Coast Lines R.R. Co.*, 540 F.2d 699, 707 (4th Cir.1976), and it should be made only "after 'a rigorous analysis' of the particular facts of the case." *In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir.), *cert. denied sub nom. Anderson v. Aetna Casualty & Surety Co.*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). A well developed factual record is particularly important where, as is true here at least in large part, class certification is challenged on the asserted ground that the proposed class action would be unmanageable. The Court of Appeals for the Fourth Circuit has made this clear:

> Before a ruling is made denying class action certification on unmanageability grounds, hard data should be presented to the district court as to the actual difficulty—or ease—involved in determining class membership and managing this proceeding.

*Windham*, 565 F.2d at 64 n. 5 (quoting *Neely v. United States*, 546 F.2d 1059,

1071 (3d Cir.1976)). Defendants' motion must be seen against this background.

In their Second Amended Complaint, plaintiffs allege four classes, two relating to Food Lion's profit sharing plan and two relating to the rights created by COBRA [10] to continued health insurance coverage. In all cases plaintiffs seek both declaratory or injunctive relief applicable to the class as a whole, as well as certain individual remedies—principally equitable relief such as backpay, reinstatement, or the opportunity retroactively to select health plan coverage—for affected class members.

With regard to the Profit Sharing Plan, plaintiffs' first class is linked to their claim that the individual defendants, acting under a personal conflict of interest with other Plan participants, breached their fiduciary duties by maintaining unduly restrictive vesting schedules. Based on this court's holding above, issues surrounding this class are moot.

Plaintiffs' second claim relating to the Profit Sharing Plan is based on defendants' alleged violation of ERISA § 510, 29 U.S.C. § 1140, by terminating the employment of participants, pressuring participants to resign, or otherwise discriminating against participants, in order to prevent them from attaining benefits under the Plan.[11] The complaint alleges a broad scheme or pattern and practice that potentially affected all participants whose employment terminated short of full vesting within the period covered by the statute of limitations. Complaint ¶ 34(a).

Plaintiffs' claim in regard to the Group Health Plan is that defendant Food Lion denied "COBRA" continuation coverage to employees upon separation from employment. Plaintiffs' claim has two aspects and is brought on behalf of two subclasses. The first part of the claim is brought on behalf of those Group Health Plan participants, identified in paragraph 34(b)(1) of the complaint, who lost Plan coverage because of separation from employment and who were denied notice of their right to continuation coverage because their discharge was classified by Food Lion as for "gross misconduct." Plaintiffs allege, concerning this class, that—rather than tailoring its rules to fit the statute—Food Lion arbitrarily adopted a policy of defining discharge for "gross misconduct" to include all discharges based on rules 1 through 8 of the company's Rules of Conduct.

The second part of the Group Health Plan claim is brought on behalf of the class, identified in paragraph 34(b)(2) of plaintiffs' complaint, of all other participants who lost coverage because of separation from employment. This claim alleges that Food Lion adopted a system that consistently failed to provide separated employees with notice, or timely notice, of their right to select continuation coverage.[12]

The core of the defendants' argument is that the classes which plaintiffs have alleged cannot meet the "manageability" requirement of Rule 23(b)(3) or the "commonality" and "typicality" requirements of Rule 23(a). While defendants thus invoke several different requirements of Rule 23, all of their arguments appear to be variations on one fundamental theme: that, as a matter of law, plaintiffs' classes cannot be

**10.** A 1986 amendment to ERISA, the COBRA provisions require covered health plans to permit employees losing their Plan coverage for certain reasons, including discharge from employment—unless the discharge was for gross misconduct—to continue their health plan coverage for a temporary period at their own cost. The statute also requires that employees losing their coverage be given, within a specified time, notice of their right to continue coverage. *See* 29 U.S.C. § 1161(a) through 1166(a)(2) & (4).

**11.** As stated earlier, section 510 provides in part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary

for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...."

**12.** Plaintiffs aver that they are in possession of many COBRA notices, sent to members of the putative class, from which the untimeliness is evident from the face of the document. They also assert that they have been contacted by many former Food Lion employees who affirmed that they never received a notice.

certified because "individual facts and circumstances overshadow the common ones." Def. Reply Mem. 4–5. They rely principally on *Windham v. American Brands, Inc.,* 565 F.2d 59 (4th Cir.1977) (en banc); *Stott v. Haworth,* 916 F.2d 134 (4th Cir.1990); and *Stastny v. Southern Bell Tel. Co.,* 628 F.2d 267, 274–76 (4th Cir.1980).

Although the motions of both the plaintiffss and the defendants examine in great detail the merits of class certification, this court need not address this issue at this time. In each of the cases relied on by defendants, the question of class certification was decided on a full record, and not as a matter of law prior to the completion of discovery on issues relevant to class certification. *See, Windham,* 565 F.2d at 64; *Stastny,* 628 F.2d at 275; *Stott,* 916 F.2d at 137.

At this time, this court cannot say, as a matter of law, that the plaintiffs will be unable to certify their classes. Within the bifurcated framework set forth by the magistrate judge, further discovery may support the allegations of the plaintiffs regarding the § 501 and COBRA claims. As was noted at the hearing, the plaintiffs have not yet conducted any discovery at the headquarters of Food Lion, at least as of the date of the hearing. Such discovery may be relevant to the administrative practices alleged by the plaintiffs. It was unclear why discovery had not been conducted at the company headquarters. As a result, this court would only note that Rule 23 provides for a determination of class status "as soon as practicable," *Stastny,* 628 F.2d at 275, and will direct the magistrate judge to establish a new schedule by which class certifcation is to be completed. Therefore, the defendants' motion for denial of class certification must be denied.

## IV. *PLAINTIFFS' MOTION TO SET ASIDE THE ORDER OF THE MAGISTRATE JUDGE DENYING PLAINTIFF'S MOTION TO COMPEL*

Briefly, and at the risk of repetition as it relates to the instant issues, plaintiffs allege on behalf of themselves and others similarly situated that defendants have violated Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1140, by engaging in a pattern and practice of discrimination against them to deprive them of benefits in the Plan. This discrimination, plaintiffs allege, took various forms, including, but not limited to, discipline, demotion, transfer, termination and other forms of pressure to force plaintiffs to quit their employment at Defendant Food Lion prior to attaining full vesting in the Plan. Plaintiffs include eleven former Food Lion employees who were participants in the Plan.[13]

Plaintiff Philbeck, who at the time of his separation from Food Lion had five years of service and was thus 25% vested in the Plan, alleges that, *inter alia,* one particular form of discrimination was directed at him. Specifically, Plaintiff Philbeck claims that in June 1988 he had switched from full-time status to part-time status, working only the minimum hours required by then Food Lion policy to remain employed. He further alleges that, in 1988, Food Lion specifically targeted for termination employees like himself who were working only a minimal number on hours, but who would become fully vested in the Plan if they remained employed at Food Lion until December 18, 1988 when the five-year "cliff" vesting schedule was to become effective. Plaintiff Philbeck asserts that pursuant to this policy he was terminated on July 1, 1988, and thereby forfeited $13,923, the non-vested 75% of his Plan account at that time.

Defendants categorically deny all liability and specifically assert that they did not discriminate against any Food Lion employee to deny them benefits in the Plan. With regard to Plaintiff Philbeck, defendants assert that he voluntarily terminated his employment to return to school.

---

**13.** The remaining seven plaintiffs are spouses or children of the former Food Lion employee plaintiffs.

Pursuant to an August 29, 1991 Order issued by United States Magistrate Judge Robert S. Carr, discovery in this action is to proceed on a bifurcated basis. Discovery regarding the named plaintiffs' individual claims and relating to the criteria for class certification set forth in Rule 23 of the Federal Rules of Civil Procedure may proceed, but discovery relating to the merits of the class claims may not until a determination as to the propriety of class certification has been made.[14]

The instant dispute between the parties arose during the deposition of one of Food Lion's current supervisory employees and relates to two Food Lion computer-generated reports distributed on a company-wide basis, the "Zero–Hour Report" and the "750–Hour Report". The "Zero–Hour Report" identifies all Food Lion employees who, as of June 24, 1988, had worked less that 60 hours in 1988. Plaintiffs contend that this Report was used by Food Lion to identify for termination or other forms of discrimination employees who, like Plaintiff Philbeck, would become fully vested in the Plan as of December 18, 1988, but who were then working only the minimal number of hours to stay on Food Lion's payroll.[15] For their part, defendants assert that the "Zero–Hour Report" was not used for this purpose, asserting that not one person on this report was fired.

The "750–Hour Report" identifies Food Lion employees who had worked, as of the date of the Report, 750 or more, but less than 1000, hours in that particular year. The purpose of this report, defendants assert, was to notify its supervisors as to which employees were likely to be short of the 1000 hours needed to qualify for a year

of service in the Plan, and, armed with this information, the supervisors supposedly could give such employees the opportunity to work the hours needed to reach 1000 hours for that year. Plaintiffs, on the other hand, assert that they are entitled to determine if the true purpose of this Report was exactly the opposite, *i.e.*, that armed with this information, Food Lion supervisors could schedule employees identified on the Report in a manner to ensure that they would not reach the 1000–hour mark.

The zero-hour and 750–hour reports at issue here were produced to the plaintiffs with the social security numbers and identities of the individual employees redacted. At the December 14, 1990 hearing, the parties entered into an agreement related to this discovery issue and agreed that Food Lion would produce to the plaintiffs a copy of its profit-sharing computer tape for the time frame covered by the zero-hour and 750–hour reports. Pursuant to this agreement, no employees' names were included in the tapes, but each employee was assigned a "unique identifier number" for statistical analysis purposes. The parties also agreed the defendants would provide plaintiffs with cross-indexes showing the unique identifier number of each Plan participant appearing on the zero-hour report and the 750–hour report.[16] This tape also indicates each eligible employee's status with respect to vesting in the Profit–Sharing Plan, his or her employment status (*e.g.*, whether he or she is an active employee or has separated), all contributions made by Food Lion to the employee's Plan ac-

**14.** Discovery regarding the Rule 23 criteria was subsequently stayed pending this Court's resolution of Defendants' pending Motion for Denial of Class Certification.

**15.** In making this assertion, Plaintiffs rely upon a series of memoranda, obtained in discovery, authored by Food Lion senior officials, including Defendant Smith, Food Lion's President and Chief Executive officer, which culminated in a memorandum from Smith to all Food Lion supervisory personnel which states, *inter alia*, "it will be our policy not to allow an employee to remain on our active payroll for the sole reason

to 'hang on' until the end of the year so they can collect their full Profit Sharing balance."

**16.** Pursuant to the plaintiffs' request, the defendant Food Lion has provided plaintiffs with a cross-index which identifies each person whose identity appears on either the "750–hour" or "zero-hour" report and also appears in the Food Lion profit sharing tapes. With these cross indices the plaintiffs can obtain the data from the profit sharing tapes to determine each person's pension plan eligibility status and his/her employment status.

count and the termination code for each separated employee.[17]

During the deposition in question, the deponent, who had supervised one of the named plaintiffs, testified that he had seen the particular "750–Hour Report" shown to him or similar reports. Further, he stated that he was able to identify some of the employees listed on the report as employees who he had supervised. Plaintiffs asked the deponent if he would identify who such employees were. At this point, defendants' counsel instructed the witness not to answer the question, asserting that such line of questions pertained only to the merits of the class claims, and not to the claims of any individual named plaintiff. See Transcript of Telephone Conference Hearing, 2/14/91, at p. 3, line 21 through p. 4, line 12.

Thereafter, pursuant to Rule 12.02 of this court, the parties conferred further as to the propriety of defendants' counsel's instruction not to answer, but no agreement between the parties could be reached. During this conference, defendants' counsel indicated that this same instruction would apply to the "Zero–Hour Report".

Plaintiffs then moved for an order compelling the deponent to answer the question, asserting that, because an individual claiming employment discrimination in the form of disparate treatment can introduce evidence regarding the employment history of similarly situated employees and the overall discriminatory practices and environment of the employer, the proposed line of questioning directly relates to plaintiffss' efforts to prevail on their individual claims. Defendants argued that all questions regarding the Reports "are purely questions that go to the merits of the class discovery". Tr. at 6.

In denying plaintiffs' motion, the magistrate judge held that the plaintiffs failed to state, "any reason why a particular deponent should tell [them] which employees worked specifically for him or where they are now, ..." *Id.*, at p. 28, lines 1–4. Thus, Magistrate Judge Carr denied the plaintiffs' motion to compel and the plaintiffs have moved to set aside this ruling.

■ The standard of review that this Court must use in reviewing this appeal is a "clearly erroneous" one. Rule 72(a) of the Fed.R.Civ.P. sets forth:

> ... the district judge to whom the case is assigned shall consider objections made by the parties, provided they are served and filed within 10 days after the entry of the order, and shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law.

For the Court to set aside the magistrate judge's ruling, it must find that the ruling was clearly erroneous or contrary to law. A finding has been determined to be clearly erroneous if the record lacks substantial evidence to support it. *Raley v. Kleppe*, 867 F.2d 1326, 1328 (11th Cir.1989).

■ It is a firmly established principle that district courts have wide latitude in controlling and fashioning discovery. *Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir.1986) (citations omitted). In addition, limitations on discovery are "dictated 'only be relevance and burdensomeness.'" *Id.* at 684. At this stage, the court does not understand the defendants' to argue that the question was too burdensomeness; rather, the thrust of the defendants' argument is the relevance of the question within the discovery framework set forth by the magistrate judge.

■ As both sides have noted, evidence regarding "similarly situated" employees is a proper subject of discovery in a case alleging an individual claim of employment discrimination. *Id.* at 684; *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1983). Therefore, the focus of our inquiry is whether the employees about whom the inquiry was made were similarly situated to the named plaintiffs.

For purposes of the instant question, the relevant group of similarly situated em-

---

**17.** Food Lion used the following codes to indicate the circumstances of an employee's termination: the codes are 1—voluntary quit; 2—discharged; 3—death or disability; 4—other.

ployees would be those employees who were participating in the Plan and who had been terminated by Food Lion prior to vesting in their plan. Not every employee on the 750–hour or zero-hour report, however, falls into this category. In *Ardrey*, the court was persuaded by the fact that the district court had allowed discovery, including the individuals' names, regarding employees who were similarly situated to the individual plaintiffs in that case.

Likewise in this case, inquiry into the employment histories of those employees who were terminated by Food Lion, were on either the zero-hour or 750–hour reports and were plan participants would be relevant to the plaintiff's individual claims. The defendants argue that all the information the plaintiffs need can be gleaned from the reports and the cross indexes. Further, the defendants rely on *Ardrey* for the proposition that because the plaintiffs can formulate statistical data on Food Lion's employment patterns from the various reports, the defendants have satisfied their discovery obligations. While this is true to a certain extent, this court does not read *Ardrey* to stand for the entire breadth of the defendants' proposition. Rather, the holding of *Ardrey* is simply that statistical evidence is clearly relevant in a pattern or practice discrimination case. *Ardrey*, 798 F.2d at 684.

Thus, the generation of these reports by the defendants certainly sets the limits within which the plaintiffs may conduct their discovery. For example, based on the reports, it should be clear which employees were on either of the reports, were participants in the plan and were terminated involuntarily from Food Lion. Since it can be said that these employees are similarly situated to the named plaintiffs, asking their name from their supervisor, who was also the supervisor of a named plaintiff, is within the bounds of discovery.

Conversely, if an employee was not a plan participant, or was not on either report, or was not terminated involuntarily, this court does not believe that they are similarly situated to the named plaintiffs. In this context, the question at issue would be improper. Although the plaintiffs argue that all employees on the lists are similarly situated, including those who left Food Lion voluntarily, this approach is overly broad. The plethora of reasons for an employee's voluntary departure preclude these employees from being considered as similarly situated at this stage. As a result, as posed before the magistrate judge, the question was improper because it pertained to any employee who the supervisor recognized from the list rather than focusing on specific employees who not only were on either of the reports, but were also pension plan participants and had been terminated involuntarily.

Returning to *Ardrey*, the issue is whether the discovery fashioned by this court prevents the plaintiffs from gathering evidence to show that Food Lion had discriminatory employment practices regarding those individuals who were about to vest in their pension plans. The approach fashioned by this court gives the plaintiffs ample opportunity to explore the potential bases for their claim without conducting class discovery prior to certification. Therefore, based in the foregoing, it is

ORDERED, that the defendants' motion for partial summary judgment be, and the same is hereby, granted. It is

ORDERED FURTHER, that the defendants' motion for denial of class certification be, and the same is hereby, denied. It is

ORDERED FURTHER, that the plaintiffs' order to set aside the order of the magistrate judge be, and the same is hereby, denied.

AND IT IS SO ORDERED.